**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| PATRA NOUMOFF, | : | Case No. 1:20-cv-395 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| CHECKERS DRIVE-IN | : | |
| RESTAURANTS INC., | : | |
| | : | |
| Defendant. | : | |

---

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 30). Plaintiff filed a response in opposition (Doc. 42), to which Defendant replied in support (Doc. 43). For the reasons provided below, Defendant's Motion is **GRANTED**.

### FACTS

This action revolves around whether Defendant Checkers Drive-In Restaurants, Inc. discriminated against and mistreated Plaintiff Patra Noumoff during her employment with Defendant and subsequent termination. Defendant is a nationwide corporation with approximately 4,700 active employees throughout its 265 restaurants and support centers. (Defendant Discovery Responses, Doc. 30-3, Pg. ID 783.) In 2018, Defendant owned the Rally's Restaurant in Spring Grove, Ohio ("Spring Grove Rally's"). (Compl., Doc. 1, Pg. ID 3.) Plaintiff was intermittently employed at the Spring Grove Rally's between 2013 and 2018. (*Id.*) In 2018, prior to her termination, Plaintiff was the

general manager of the Spring Grove Rally's. (*Id*.)

I.    **Defendant's Employee Handbook**

Defendant has an Employee Handbook (the "Handbook") for all of its Rally's locations, including the Spring Grove Rally's. (*See* Employee Handbook, Doc. 30-4.) Multiple sections of the Handbook are relevant to this action. First, the Handbook includes a section titled "What We Can Expect From You." (*Id*. at 854.) Included is a subsection titled "Employee Conduct and Work Rules" that provides multiple examples of "serious infractions of rules of conduct that may result in disciplinary action, up to and including termination of employment . . ." (*Id*. at 858.) Serious infractions relevant here include insubordination and failure to be courteous to guests and fellow employees, including management. (*Id*. at 858-59.)

Next, the Handbook contains a section titled "Your Benefits," which includes subsections outlining an employee's vacation pay and sick pay policies. (Employee Handbook, 30-4, Pg. ID 834.) This section of the Handbook provides the amount of time an employee may take of paid vacation depending on an employee's position. (*Id*. at 835-36.) The guidelines for taking paid vacation state that "an employee should complete the Vacation Pay Request form and submit it to their . . . Supervisor or District Manager for approval." (*Id*. at 836.)

The Handbook explains that paid vacation time is not a guarantee. (*See id*.) Instead, the requests "will be reviewed (and either approved or denied) based on a number of factors, including business needs, staffing requirements, etc." (*Id*.) Although disputed, Defendants contend that general managers' requests for paid vacation time must be

2

approved by district managers. (Defendant Discovery Responses, Doc. 30-3, Pg. ID 772.)

Additionally, the Handbook includes a section of "Time Keeping & Pay." (Employee Handbook, Doc. 30-4, Pg. ID 810.) Time keeping is the responsibility of the employee and supervisor. (*Id.* at 878.) An employee's time is recorded in a computer system, known as RTI, that registers precise times of an employee's clock in and clock out. (Williams Dep., Doc. 29, Pg. ID 554.) General managers have the authority to override the RTI system and adjust any employee's time. (*Id.* at 566-67.)

The "Time Keeping & Pay" section includes the process employees and supervisors must take if corrections or modifications to time keeping is required. (Employee Handbook, Doc. 30-4, pg. ID 878.) It states, "[i]f corrections or modifications are made to the time record, both the employee and the Supervisor must verify the accuracy of the changes by initialing the time record." (*Id.*) General managers are expected to modify and adjust the time keeping of their employees in an effort to fix any incorrect payroll problems. (Del Pozo Dep., Doc. 35, Pg. ID 1220-21.) A payroll adjustment form is required to be completed if there are adjustments made to an employee's time. (Williams Dep., Doc. 29, Pg. ID 552.) "Any Supervisor knowingly . . . altering, falsifying, tampering with time records, or recording time on another employee's time record may result in disciplinary action, up to and including termination of employment." (Employee Handbook, Doc. 30-4, Pg. ID 878.)

Lastly, the Handbook contains a "Progressive Discipline" subsection to the previously mentioned "What You Can Expect From Us" section. (Employee Handbook, Doc. 30-4, Pg. ID 808.) The Handbook explains that Defendant "may use progressive

3

discipline at its discretion and may bypass one or more steps as appropriate." (*Id.* at 831.) It then establishes that the normal progression of discipline is "verbal warning, written warning, final warning, and termination of employment." (*Id.*) Violations of the Employee Conduct and Work Rules section may result in progressive discipline or, if serious enough, termination. (*Id.* at 832.)

## II. Plaintiff's Initial Encounters with Velagic

As previously mentioned, Plaintiff was employed as the general manager at the Spring Grove Rally's in 2018 prior to her termination. (Compl., Doc. 3, Pg. ID 3.) As general manager, Plaintiff was "responsible for executing the restaurant plan to achieve established standards, sales, and profits," which was done "primarily by staffing, personnel training, [and] operating and maintaining the restaurant such that Guest satisfaction [was] maximized." (General Manager Job Description, Doc. 30-5, Pg. ID 899.) Plaintiff was also required to follow the policies and procedures outlined in the Handbook and manage "employee files and time punch reports" in accordance with the Handbook. (*Id.* at 900.) Plaintiff admitted to reading the Handbook at the outset of her employment in 2013 and that she was aware of the progressive discipline structure. (Requests for Admissions, Doc. 30-8, Pg. ID 907, 911.) Additionally, Plaintiff testified that she was aware during her time as general manager that managing "time punch reports" was a "key obligation" of a general manager. (Noumoff Dep., Doc. 27, Pg. ID 338.)

On January 9, 2018, Almir Velagic was employed by Defendant as District Manager for the Cincinnati Region. (Interrogatories, Doc. 30-3, Pg. ID 770-71.) Plaintiff's relationship with Velagic was tumultuous from the beginning. First, the two had

4

disagreements over whether labor at the Spring Grove Rally's was too high. (*See* January Email Exchange, Doc. 30-10, Pg. ID 925-928.) Then, on January 24, 2018, Velagic informed Plaintiff that he had "mystery shopped" at the Spring Grove Rally's on three separate occasions, and the service was "below par every time." (*Id.* at 928.) In February, Velagic lodged growing concerns that Plaintiff was insubordinate to executives. (*See* February Email Exchange, Doc. 30-11.) However, despite the advice of Human Resources to discipline Plaintiff, Velagic elected to have a "discussion," with Plaintiff and inform her that the two "have to work as a team." (*Id.* at 930, 933.) Thus, no formal discipline occurred.

On April 4, 2018, Plaintiff emailed Gordan Rowan, Defendant's Operations Director, regarding her growing concerns that Velagic treated Plaintiff differently due to her gender. (*See* April Email Complaint, Doc. 38-1.) Plaintiff specifically stated that she felt that Velagic, "hold[s] my gender against me like a handicap[.]" (*Id.* at 1317.) Specifically, Plaintiff lodged multiple complaints against Velagic, including that he showed little concern for the Spring Grove Rally's success. (*Id.*) Plaintiff repeatedly voiced that she believed this treatment was because she was a woman. (*Id.*) At the outset, Rowan solely responded that he had received the complaint and would get back to her. (*Id.* at 1316.)

Following Plaintiff's email to Rowan, April Williams, Defendant's Employee Relations Manager, opened an investigation into Plaintiff's complaint of alleged gender discrimination. (April 4 Investigation File, Doc. 30-15, Pg. ID 954.) Williams spoke to Plaintiff on April 9, 2018. (*Id.* at 957) Plaintiff reiterated that she believed she was being

treated differently by Velagic due to her gender. (*Id.*) She explained in more detail the actions previously described in her email to Rowan, including that Velagic was rarely at the Spring Grove Rally's and would only come during the lunch hour. (*Id.* 957-959.) Then, from April 12, 2018 through April 17, 2018, Plaintiff and Williams exchanged text messages where Williams requested Plaintiff provide information regarding Velagic's visits to the Spring Grove Rally's. (*Id.* at 955-956.) Williams asked for such information on two separate occasions. (*Id.*) Plaintiff never provided the information. (*Id.*) Therefore, Williams closed the investigation on April 19, 2018 and no discipline was issued to Velagic. (*Id.* at 956.)

During the time period that Williams was investigating Plaintiff's initial complaint, Plaintiff had an additional negative encounter with Velagic. (Noumoff Dep., Doc. 27, Pg. ID 229-30.) On the morning of April 16, 2018, Plaintiff called Velagic regarding a situation that occurred at the Spring Grove Rally's. (*Id.*) During the call, Plaintiff alleges that Velagic yelled at her did not allow her to explain the situation. (*Id.* at 230.) She eventually hung up on Velagic. (*Id.* at 231.) Then, Plaintiff emailed Rowan and Williams, stating that she had "made multiple attempts to address this situation" and that she "[would] not be treated this way and screamed at." (April 16, 2018 Email, Doc. 28-2, Pg. ID 1319.) Sections of the email were capitalized. (*Id.*) She again requested to make a formal complaint against Velagic. (*Id.*) The record does not reflect additional correspondence following Plaintiff's email.

Rather, Plaintiff received a written warning due to hanging up on Velagic and the nature of her email to Williams and Rowan. (Written Warning, Doc. 30-17, Pg. ID 981.)

6

The written warning was for her failure to be courteous in violation of the Employee

Handbook. (*Id.*) The written warning states:

> On April 16, 2018, you had a telephone conversation with your [district manager], Almir Velagic, regarding an issue at the restaurant. During that conversation, you were disrespectful in your communication when you disagreed with what he said by replying, "Ugh!" and then hung up the phone on him. After you hung up on Almir, you sent an email to your Company Operations Director, Gordon Rowan, and to Human Resources typing in all capital letters which is very commonly referred to and known as "yelling" in written communications. . . Further violations of this or any other Checkers/Rally's policies may result in disciplinary action, up to and including termination.

(*Id.*)

### III.    Plaintiff's Sick and Paid Vacation Leave

On May 28, 2018, Plaintiff emailed Marc Mediate, the Vice President of Operations,

regarding taking a sick day, jumping the chain of command. (May 28, 2018 Email, Doc.

38-5, Pg. ID 1322-23.) She informed Mediate that she would not attend her scheduled

shift due to illness. (*Id.* at 1323.) She also informed Mediate that she had sick days to use

but, when she contacted Velagic the night before regarding her illness, he told her that

she was required to attend work because she was unable to find coverage. (*Id.*). Lastly,

she informed Mediate that she believed Velagic had treated her worse than before she

submitted her complaint of gender discrimination in April. (*Id.*) The record does not

reflect any discipline despite failing to attend work.

Despite not being disciplined for her absence on May 28, 2018, Plaintiff received a

final warning on June 12, 2018 for alleged insubordination. (Final Warning, Doc. 30-19,

Pg. ID 983.) On June 1, 2018, Rowan informed Plaintiff that her approved vacation dates

7

were June 4, 2018 through June 8, 2018. (June 1, 2018 Email, Doc. 38-4, Pg. ID 1321.) She was informed that she "would be required to return to work on the [sic] June 9th for [her] normal work week." (*Id.*)

The final warning states that, on June 1, 2018, Rowan informed Plaintiff that she could take June 4th, June 5th, June 6th, June 7th, and June 8th or, in the alternative, June 9th or June 10th for vacation. (*Id.*) It further explains that she did not report to work on June 4th or June 5th and, instead, took vacation days that were not approved. (*Id.*) On the contrary, Plaintiff testified that she attended work on both June 4th and June 5th. (Noumoff Dep., Doc. 27, Pg. ID 349.) She testified that she informed Velagic that she worked the dates, but Velagic stated that, "No you weren't. We're not discussing this. If you have any issues, call April Williams." (*Id.* at 349-50.) The record is unclear as to which dates Plaintiff took vacation time or if she contacted Williams due to the alleged discrepancy.

### IV. Plaintiff's Alleged Time Manipulation and Subsequent Termination

On October 2, 2018, Van Estill, a former employee at the Spring Grove Rally's, contacted Williams to report that Defendant owed him wages for time he had worked in late July. (Plaintiff Termination Investigation File, Doc. 30-21, Pg. ID 1000.) According to Estill, he was owed for 28 minutes worked on July 31, 2018 and 3.817 hours worked on August 8, 2018. (*Id.*) Due to the alleged discrepancy, Williams opened an investigation into the wages owed. (*Id.* at 996.) During the course of her investigation, Williams discovered that a manager had adjusted Estill's time on July 31, 2018. (Plaintiff Termination Investigation, Doc. 30-21, Pg. ID 1015.) The timekeeping records showed

that a manager added a 28-minute break on Estill's timecard for that date. (*Id.*) Additionally, the records showed adjustments in Estill's favor during his time at the Spring Grove Rally's. (*Id.* at 1017-18.)

After determining that there was an adjustment to Estill's RTI, on October 11, 2018, Williams emailed Plaintiff and requested she send a picture "of the Time Punch Change Binder/Time Edit report for 7/31/2018, if there is one in the binder." (Plaintiff and Williams October Re Estill Email Exchange, Doc. 30-22, Pg. ID 1046.) Plaintiff informed Williams on October 12, 2018 via email that the documents were not in the binder. (*Id.*) However, later that day, Plaintiff sent pictures of the documents requested via text message. (October 12, 2018 Text Message Exchange, Doc. 30-23, Pg. ID 1047-49.) Plaintiff informed Williams that she had attempted to send the pictures through email, but they would not deliver. (*Id.* at 1048.)

A handwritten note on one of the documents suggested that Estill clocked out for his break but failed to clock back in. (October 12, 2018 Text Message Exchange, Doc. 30-23, 1049.) However, in an email sent from Williams to an executive of Defendant, Williams confirmed via video footage from the Spring Grove Rally's that Estill worked during the time period he was allegedly on break. (Plaintiff Termination Investigation, Doc. 30-21, Pg. ID 998.) Thus, Williams determined that Estill was owed for the 28-minute adjustment on July 31, 2018 but not owed for the adjustment on August 8, 2018. (*Id.* at 1009.)

Also on October 12, 2018, Plaintiff emailed Williams to inform her that a former employee, Quina Bargainer, had reported missing wages from September 13, 2018.

9

(Plaintiff and Williams October Re Bargainer Email Exchange, Doc. 30-24, Pg. ID 1050.) Plaintiff informed Williams that Bargainer claimed to be owed for 3.75 hours. (*Id.*) Plaintiff testified that, after watching footage from the day Bargainer claimed to be missing wages, Plaintiff determined that Bargainer was owed the wages. (Noumoff Dep., Doc. 27, Pg. ID 360.) Plaintiff testified she emailed the Payroll Department and requested a payroll adjustment form. (*Id.* at 360-61.) When no one responded, she and Bargainer handwrote the hours owed and signed the handwritten note. (*Id.* at 361.) Plaintiff was informed that the Payroll Department would not accept the note. (Plaintiff and Williams October Re Bargainer Email Exchange, Doc. 30-24, Pg. ID 1050.) Plaintiff later submitted the proper payroll adjustment form. (Plaintiff Termination Investigation File, Doc. 30-21, Pg. ID 1044.)

The September 13, 2018 RTI shows that Bargainer clocked in at 6:06 PM. (Plaintiff Termination Investigation File, Doc. 30-21, Pg. ID 1042.) Bargainer then clocked out at 7:56 PM. (*Id.*) She later clocked back in at 8:31 PM and, immediately thereafter, clocked back out at 8:32 PM. (*Id.*) However, the record seems to reflect that Plaintiff adjusted Bargainer's time on September 17, 2018. (*Id.*) It appears to the Court that Plaintiff adjusted Bargainer's clock out time to 8:32 PM. (*Id.*) However, Bargainer's original clock out time seemed to be 12:08 PM. (*Id.*) Plaintiff acknowledges that she adjusted Bargainer's time and "failed to clock her out at the correct time." (Noumoff Dep., Doc. 27, Pg. ID 364.) Plaintiff contends such failure was by mistake. (*See id.* at 364-65.)

Due to the time adjustment complaints, Williams opened an investigation into Plaintiff on October 12, 2018 for manipulating time. (Plaintiff Termination Investigation

File, Doc. 30-21, Pg. ID 989.) On October 16, Williams concluded her investigation and determined that Plaintiff purposefully manipulated the time of the two employees in question to "take those hours away[.]" (*Id*. at 995.) Thus, Williams had a phone call with Velagic. (*Id*. at 994.) Williams, in a follow up email, reiterated her findings to Velagic and suggested that, based on her findings, Plaintiff be terminated. (*Id*. at 995.) Carlos Del Pozo, Defendants Senior Director of Operations, supported the decision to terminate Plaintiff. (*Id*. at 994.) Therefore, Plaintiff was terminated on October 24, 2018. (*Id*. at 990.)

## V. Procedural History

Plaintiff received her Notice of Right to Sue from the Equal Employment Opportunity Commission on February 19, 2020. (Compl., Doc. 1, Pg. ID 2; Answer, Doc. 7, Pg. ID 26.) Following receiving the Right to Sue, Plaintiff filed this action on May 18, 2020. (*See* Compl., Doc. 26.) Plaintiff brings claims of gender discrimination and retaliation in violation of federal and Ohio law. (*See id*.) Defendant now seeks summary judgment on each claim, arguing that no genuine issue of material fact exists and that Defendant is entitled to summary judgment on each claim as a matter of law.

## LAW

Courts must grant summary judgment if the record "reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(c)). Once the movant has met its initial burden of showing that no genuine issue of material fact remains, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

11

(1986). To do so, the nonmovant must present "significant probative evidence . . . on which a reasonable jury could return a verdict" in their favor. *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009).

The court "must view the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007). This requirement, however, does not mean that the court must find a factual dispute where record evidence contradicts wholly unsupported allegations. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (*citing Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). "If a moving party fulfills its burden of demonstrating that no genuine issue of material fact exists, the nonmoving party, to receive a trial, must present some significant probative evidence creating a factual dispute." *Stratienko v. Cordis Corp.*, 429 F.3d 592, 597 (6th Cir. 2005).

## ANALYSIS

I. **Defendant is Entitled to Summary Judgment on Plaintiff's Gender Discrimination Claims as a Matter of Law.**

Title VII makes it unlawful for an employer "to fail or refuse or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Additionally, it is unlawful pursuant to Ohio law for an employer "because of . . . sex. . . to discharge without just cause, to refuse to hire, or otherwise to discriminate against that

person . . ." Ohio Rev. Code § 4112.02. Gender discrimination claims brought pursuant to Ohio law are generally analyzed the same as Title VII claims. *Ohio Civ. Rights Comm. v. David Richard Ingram, D.C., Inc.*, 630 N.E.2d 669, 674 (Ohio 1994). Therefore, both of Plaintiff's gender discrimination claims will be analyzed together applying the same law.

Gender discrimination claims may be established by direct evidence or indirect evidence. *Vredevelt v. GEO Group, Inc.*, 145 F. App'x 112, 127 (6th Cir. 2005). Here, it is undisputed that Plaintiff attempts to prove her claims through indirect evidence. When a plaintiff attempts to prove a gender discrimination claim with indirect evidence, a court must apply the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (6th Cir. 2007).

Under the *McDonnell Douglas* framework, the plaintiff has the initial burden to prove a prima facie case of gender discrimination. *Redlin v. Grosse Pointe Public School System*, 921 F.3d 599, 606 (6th Cir. 2019). If the plaintiff satisfies her initial burden, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. *Id.* at 607. Lastly, if the defendant satisfies its burden, the plaintiff must prove by a preponderance of the evidence that the stated reasons were pretext for discrimination. *Id.*

### a. The Court Assumes that Plaintiff Established a Prima Facie Case of Gender Discrimination.

To establish a prima facie case of gender discrimination, the plaintiff has the burden of showing: (1) she was a member of a protected class, (2) she was subject to an adverse employment action, (3) she was qualified for the position, and (4) others,

similarly situated and outside the protected class, were treated differently. *Bruce v. Meharry Medical College*, 692 F. App'x 275, 278 (6th Cir. 2017). Here, it is uncontested that Plaintiff is a member of a protected class, was subjected to an adverse employment decision, and was qualified for the position. Therefore, the Court need only address the fourth prong: whether others, similarly situated to Plaintiff and outside the protected class, were treated differently.

To satisfy the fourth prong, Plaintiff must offer proof of similarly situated male employees who Defendant treated more favorably than Plaintiff. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). "In employment discrimination cases, the plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly situated." *Knox v. Neaton Auto Products Mfg., Inc.*, 375 F.3d 451, 458 (6th Cir. 2004). Rather, the plaintiff must establish that the male comparator is similar "in all of the relevant aspects." *Id.*

Defendant argues that Plaintiff fails to identify any similarly situated male employees that Velagic treated more favorably. Specifically, Defendant claims that Velagic, while he may be "rude," treats all employees the same regardless of gender. (Williams Dep., Doc. 29, Pg. ID 639-40.) Plaintiff disagrees, stating that he would "cut up" with the male managers, but would speak harshly to Plaintiff and other female managers. (Noumoff, Doc. 27, Pg. ID 182-83, 185.)

Here, the Court acknowledges that the facts presented seem to paint a picture suggesting that a genuine issue of material fact exists as to whether Plaintiff established a prima facie claim of gender discrimination. However, the Court, without deciding

14

whether Plaintiff satisfied her burden, will assume that a prima facie case has been established for Plaintiff's gender discrimination claim.

### b. Defendant Established Legitimate, Nondiscriminatory Reasons to Terminate Plaintiff.

Because the Court assumes that Plaintiff established a prima facie case for gender discrimination, the burden shifts to Defendant to articulate some legitimate, nondiscriminatory reason for Plaintiff's termination. *See Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 654 (6th Cir. 2012). Defendant's burden "is merely one of production, not persuasion, and it does not involve a credibility assessment." *Sjostrand v. Ohio State Univ.*, 750 F.3d 596, 599 (6th Cir. 2014).

In this case, Defendant meets its burden. Defendant provided evidence of multiple Handbook violations committed by Plaintiff. Plaintiff received a written warning for her alleged failure to be courteous to Velagic, Williams and Rowan during her telephone call with Velagic and subsequent email to Williams and Rowan. (Written Warning, Doc. 30-17, Pg. ID 981.) Plaintiff received a final warning for insubordination due to taking vacation leave that was allegedly not previously approved. (Final Warning, Doc. 30-19, Pg. ID 983.) After conducting an internal investigation, Williams determined that Plaintiff allegedly violated the Handbook by manipulating two employees' time. (Plaintiff Termination Investigation File, Doc. 30-21, Pg. ID 995.) All alleged Handbook violations are grounds for termination. (Employee Handbook, Doc. 30-4, Pg. ID 831.)

Because Defendant's burden is only one of production, Defendant satisfied its burden to establish that it had legitimate, nondiscriminatory reasons to terminate

Plaintiff.

### c. Plaintiff Failed to Establish That Defendant's Reasons Were Solely Pretext.

Here, because Defendant established a legitimate, nondiscriminatory reasons to terminate Plaintiff, the burden shifts to Plaintiff to establish that such reasons are pretext. *Redlin*, 921 F.3d at 607. Plaintiff may establish pretext by showing: (1) Defendant's stated reasons have no basis in fact, (2) the reasons given are not the actual reasons for termination, or (3) the reasons are insufficient to explain Plaintiff's termination. *Reynolds v. Chipotle Mexican Grill, Inc.*, 120 F.Supp.3d 704, 714 (S.D. Ohio 2015). To overcome this final burden, Plaintiff "must produce sufficient evidence from which the jury could reasonably reject [Defendant's] explanation and infer that [Defendant] intentionally discriminated against her." *Powell-Pickett v. AK Steel Corp.*, 904 F.Supp.2d 767, 781 (S.D. Ohio 2012).

"If an employer demonstrates an honest belief in its proffered non-discriminatory reason for discharging an employee, the employee cannot establish pretext just because the reason is ultimately shown to be incorrect." *Nathan v. Ohio State Univ.*, 984 F.Supp.2d 789, 798 (S.D. Ohio 2013). Plaintiff is required to "put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Id.* (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001)). And "[c]onclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment." *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008).

Here, Plaintiff failed to satisfy her final burden. No genuine issue of material fact exists as to whether Defendant's reasons for terminating Plaintiff were pretext. Plaintiff was cited for violating the Handbook on at least four separate occasions, all of which would allow Defendant to terminate Plaintiff in accordance with Defendant's policies. (*See* Employee Handbook, Doc. 30-4.) First, the Handbook states that insubordination and a failure to be courteous to guests and fellow employees, including management, constitutes a "serious infraction of rules of conduct that may result in disciplinary action, up to and including termination of employment . . ." (*Id.* at 858.) Additionally, the Handbook allows for a supervisor, such as a general manager, to be terminated due to "knowingly . . . altering, falsifying, [or] tampering with time records . . ." (*Id.* at 878.)

On April 16, 2018, Plaintiff was found to be discourteous to her direct supervisor, Velagic, when she hung up on him during a phone call. (Written Warning, Doc. 30-17, Pg. ID 981.) Also, due to the nature of her email following the phone call, Plaintiff was determined to be discourteous to Williams and Rowan as well. (*Id.*) Plaintiff was warned that further violations of the Handbook may result in her termination after this incident. (*Id.*)

Plaintiff then received a final warning on June 12, 2018 for insubordination, due to taking vacation time on days she was scheduled to work and not approved to take off. (Final Warning, Doc. 39-19, Pg. ID 983.) Although the facts surrounding the final warning are in dispute, Plaintiff was informed that "[f]urther violation of this or any other Checkers/Rally's policies will result in termination . . ." (*Id.*) Other than Plaintiff's own testimony and assertions, Plaintiff cites to no evidence on the record to persuade this

Court that Defendant, through Velagic and Rowan, did not honestly believe that Plaintiff was discourteous or insubordinate when she received her written and final warnings.

Plaintiff was terminated for knowingly altering and tampering with two employees' time records. (*See* Plaintiff Termination Investigation File, Doc. 30-21.) First, Williams was informed by Estill that he was owed for 28 minutes of work on July 31, 2018. (*Id.* at 999.) When Plaintiff submitted the required documentation to Williams during her investigation, a handwritten note suggested that Estill's time had been adjusted by a manager because Estill failed to clock out when he took a break. (October 12, 2018 Text Message Exchange, Doc. 30-23, 1049.) However, during her investigation, Williams determined via video footage that Estill was working during the time he was clocked out. (Plaintiff Termination Investigation File, Doc. 30-21, Pg. ID 998.) Additionally, Williams verified Plaintiff adjusted Estill's time. (*Id.* at 1027-28.) Then, Williams informed an executive of Defendant's that Estill's time was inappropriately adjusted by Plaintiff. (*Id.* at 997.) Thus, Defendant honestly believed that Plaintiff had knowingly altered Estill's time in violation of the Handbook.

Lastly, on the same day Williams investigated Estill's adjustments, Plaintiff informed Williams that Bargainer was owed for 3.75 hours worked on September 13, 2018. (Plaintiff and Williams October Re Bargainer Email Exchange, Doc. 30-24, Pg. ID 1050.) Plaintiff attempted to cure this mistake herself, but did not follow the proper procedure of using a payroll adjustment form and, instead, signed a handwritten note to verify that the hours were owed. (Noumoff Dep., Doc. 27, Pg. ID 360-61.) Williams launched an investigation into Bargainer's alleged time owed. (Plaintiff Termination

Investigation File, Doc. 30-21, Pg. ID 1042.) Williams determined that Plaintiff adjusted Bargainer's time, and such adjustment created the 3.75 hours owed. (*Id.*)

Williams, following the two time adjustment investigations, determined that Plaintiff was manipulating the time of her employees. (Plaintiff Termination Investigation File, Doc. 30-21, Pg. ID 989.) On October 16, Williams concluded her investigation and determined that Plaintiff purposefully manipulated the time of the two employees to "take those hours away[.]" (*Id.* at 995.) The record reflects that Williams honestly believed that such time manipulation amounted to a violation of the Handbook and warranted termination. She followed up with Velagic and Del Pozo with her findings, who each supported Plaintiff's termination. (*Id.* at 994-95.)

It is Plaintiff's burden to show that genuine issue of material fact exists as to whether Defendant's legitimate, non-discriminatory reasons were pretext for her termination. *Redlin*, 921 F.3d at 607. Because the record reflects that Defendant honestly believed that Plaintiff violated the Handbook on multiple occasions, Plaintiff was required to put forth evidence to the contrary. *Nathan*, 984 F.Supp.2d at 798. She failed to do so. Rather, she relies on her own testimony and statements to executive that Velagic discriminated against her due to her gender. However, this Court cannot find genuine issue of material fact due to "conclusory assertions, supported only by Plaintiff's own opinions[.]" *Arendale*, 519 F.3d at 605.

In this case, the Defendant honestly believed that Plaintiff violated the Handbook on numerous occasions, thereby warranting termination, and Plaintiff did not produce evidence to the contrary other than her own testimony and opinions. Thus, Plaintiff failed

19

to establish genuine issue of material fact as to whether Defendant's proffered reasons for the adverse employment actions were pretextual. As such, Defendant is entitled to summary judgment on Plaintiff's gender discrimination claim as a matter of law.

## II. Defendant is Entitled to Summary Judgment on Plaintiff's Retaliation Claims as a Matter of Law.

The opposition clause of Title VII prohibits discriminating against an employee because that employee has engaged in conduct protected by Title VII. *See* 42 U.S.C. § 2000e-3(a). The Sixth Circuit has held that the opposition clause "protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *Laster*, 746 F.3d at 730. Ohio law considers it to be an unlawful discriminatory action to retaliate against an employee "because that person has opposed any unlawful discriminatory practice." Ohio Rev. Code § 4112.02(I). Like gender discrimination claims, retaliation claims under Ohio law are analyzed the same as under federal law. *Allman v. Walmart, Inc.*, 967 F.3d 566, 571 (6th Cir. 2020). Therefore, Plaintiff's Ohio retaliation claim and Title VII retaliation claim will both be analyzed herein.

Retaliation claims may also be established through direct or indirect evidence. *Redlin*, 921 F.3d at 613. Like Plaintiff's gender discrimination claims, Plaintiff only relies upon indirect evidence to establish her retaliation claims. Courts also apply the *McDonnell Douglas* burden-shifting framework to retaliation claims relying on indirect evidence. *Id.*

Again, under the *McDonnell Douglas* framework, the plaintiff has the initial burden

to establish a prima facie case of retaliation. *Laster*, 746 F.3d at 730. If the plaintiff satisfies her initial burden, the burden shifts to the defendant to show that it possessed legitimate, nonretaliatory reasons for its actions. *Id*. Lastly, if the defendant satisfies its burden, the burden shifts back one last time to the plaintiff to demonstrate that the defendant's proffered reasons were pretext. *Id*.

### a. The Court Assumes that Plaintiff Established a Prima Facie Case of Retaliation.

To establish a prima facie case of retaliation, a plaintiff must show: "(1) she engaged in activity protected by Title VII; (2) the defendant knew of her exercise of her protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or persuasive retaliatory harassment; and (4) there is a causal connection between the plaintiff's protected activity and the adverse employment action." *Carroll v. Ohio Dept. of Administrative Services*, 555 F. App'x 512, 519 (6th Cir. 2014). Here, Defendant acknowledges that Plaintiff can establish the first three elements. (Motion for Summary Judgment, Doc. 30, Pg. ID 742). Thus, only the fourth element is in dispute.

Plaintiff's burden at the prima facie stage to provide evidence which would allow this Court "to deduce a causal connection between the retaliatory action and the protective activity" is minimal. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021). The Sixth Circuit has determined that, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal

connection for purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516,525 (6th Cir. 2008). However, "an intervening legitimate reason to take an adverse employment action will dispel an inference of retaliation based on temporal proximity." *Green v. Central Ohio Transit Authority*, 647 F. App'x 555, 560 (cleaned up).

Defendant claims that Plaintiff cannot satisfy her burden, because she cannot establish a causal connection between her complaints of gender discrimination and the adverse employment actions taken against her. Plaintiff disagrees, arguing that the temporal proximity between her complaints and receiving the written and final warnings, as well as her termination, is enough to satisfy her minimal burden at this stage. However, Defendant claims that Plaintiff's conduct in violation of the Handbook constitutes "intervening legitimate reason[s] for the adverse employment action, thus dispelling any inference of retaliation based on [] temporal proximity," in accordance with Sixth Circuit precedent. (Reply in Support, Doc. 43, Pg. ID 1396.)

Here, as the Court found with Plaintiff's gender discrimination claim, the facts presented seem to paint a picture suggesting that a genuine issue of material fact exists as to whether there was a causal connection between Plaintiff's complaints and the adverse employment actions, including her termination. However, the Court, without deciding whether Plaintiff satisfied her burden, the Court will assume a prima facie case has been established.

### b. Defendant Has Established a Legitimate, Nonretaliatory Reason to Terminate Plaintiff.

In this case, even if Plaintiff satisfied her prima facie case for retaliation, Defendant gave a legitimate, nonretaliatory reason for Plaintiff's termination. *See Laster*, 746 F.3d at 730. As with gender discrimination claims, Defendant's burden is only one of production, not persuasion. *Id.* As the Court explained above, the Defendant issued Plaintiff a written warning and a final warning prior to her termination due to alleged Handbook violations. (Written Warning, Doc. 30-17, Pg. ID 981; *see also* Final Warning, Doc. 30-19, Pg. ID 983.) Additionally, Plaintiff's termination was triggered by her alleged manipulation of two employees' time, also in violation of the Handbook. (Plaintiff Termination Investigation File, Doc. 30-21, Pg. ID 995.) The Handbook provided that each incident, separately, are grounds for termination. (Employee Handbook, Doc. 30-4, Pg. ID 832.) Thus, Defendant satisfied its burden of production and provided legitimate, nonretaliatory reasons for Plaintiff's termination.

### c. Plaintiff Failed to Establish that Defendant's Reasons Were Solely Pretext.

Lastly, the burden shifts back to Plaintiff to establish Defendant's reasons are pretext. *Briggs*, 11 F.4th at 515. Plaintiff meets this burden solely by producing "evidence sufficient that a reasonable finder of fact could reject the employer's reason." *Id.* As in gender discrimination cases, Plaintiff can prove pretext by showing the reasons: (1) had no basis in fact, (2) [were] insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action." *Id.* Plaintiff cannot establish pretext if evidence supports that Defendant honestly believed in its proffered reasons.

*Nathan*, 984 F.Supp.2d at 798. Plaintiff must put forth evidence, other than her own opinions and conclusory assertions, that would demonstrate that Defendant did not honestly believe the proffered reasons. *Id.*

As above, the Court finds that this Defendant honestly believed that Plaintiff violated the Employee Handbook when issuing Plaintiff's written warning, final warning, and terminating her. The written warning establishes that Velagic, Williams and Rowan honestly believed that Plaintiff was discourteous to each of them in violation of the Handbook. (Written Warning, Doc. 30-17, Pg. ID 981.) The final warning shows that Rowan and Velagic honestly believed that she was insubordinate in violation of the Handbook by taking unapproved vacation time. (Final Warning, Doc. 30-19, Pg. ID 983.) Williams's investigation into the time adjustments of Estill and Bargainer shows that Williams honestly believed that Plaintiff was manipulating employees' time in violation of the Handbook. (Plaintiff Termination Investigation File, Doc. 30-21, Pg. ID 989.) Plaintiff was warned within the written and final warnings that continued misconduct would result in her termination. (Written Warning, Doc. 30-17, Pg. ID 981; Final Warning, Doc. 30-19, Pg. ID 983.) Each incident alone was enough to warrant termination. (Employee Handbook, Doc. 30-4, Pg. ID 858, 878.) Despite this, Defendant proceeded through the progressive discipline as outlined in the Handbook. (*Id.* at 831-32.)

Again, it was Plaintiff's burden to show pretext through evidence that Defendant did not honestly believe in the reasons listed above. The record does not reflect, outside of Plaintiff's testimony and the single complaint she lodged that she felt that she was being retaliated against, that Defendant did not honestly believe in the proffered reasons.

24

rely on such evidence to overcome summary judgment. *See Arendale*, 519 F.3d at 605.

Accordingly, Plaintiff failed to establish genuine issue of material fact that Defendant's proffered reasons were pretext. Thus, Defendant is entitled to summary judgment on Plaintiff's retaliation claim as a matter of law.

## CONCLUSION

Based on the above analysis, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 30). Plaintiff's Complaint is **DISMISSED with prejudice**. Therefore, this case is **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND